(No. 90865.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant and Cross-Appellee, v. HENRY KACZMAREK, Appellee and Cross-Appellant.

*Opinion filed October 2, 2003.*

KILBRIDE, J., specially concurring.

James E. Ryan and Lisa Madigan, Attorneys General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (William L. Browers and Lisa Hoffman, Assistant Attorneys General, of Chicago, and Renee G. Goldfarb, William D. Carroll, Alan J. Spellberg and Christine Cook, Assistant State's Attorneys, of counsel), for the People.

Michael J. Pelletier, Deputy Defender, and Debra R. Salinger, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellee.

JUSTICE RARICK delivered the opinion of the court:
Following a jury trial in the circuit court of Cook County, defendant, Henry Kaczmarek; was convicted of murder, residential burglary, home invasion, and armed robbery. Defendant was sentenced to a term of natural

life imprisonment on the murder conviction, but no sentences were imposed on the other convictions. Defendant appealed. On March 31, 1993, the appellate court filed an opinion in which it declined to review defendant's convictions for residential burglary, home invasion, and armed robbery, due to lack of finality, but reversed the murder conviction and remanded for a new trial. *People v. Kaczmarek*, 243 Ill. App. 3d 1067 (1993). We denied leave to appeal. *People v. Kaczmarek*, 151 Ill. 2d 571 (1993).

Prior to the commencement of his second trial in November of 1996, defendant unsuccessfully moved to dismiss the State's charges on the grounds that his constitutional and statutory rights to a speedy trial had been violated. Following a retrial by jury, defendant was again found guilty of murder, and, based upon a trial court finding that the victim's murder was exceptionally brutal and heinous, defendant again received an enhanced term of natural life in prison pursuant to section 5—8—1(a)(1)(b) of the Unified Code of Corrections (Unified Code) (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(1)(b)).

Defendant appealed, arguing, *inter alia*, that he had been denied his constitutional right to a speedy trial, and challenging the validity of his life sentence, claiming the penalty enhancement scheme provided by section 5—8—1(a)(1)(b) of the Unified Code is constitutionally infirm in light of the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). The appellate court rejected defendant's speedy-trial claim, but vacated defendant's life sentence and remanded for resentencing, concluding that "the penalty scheme set forth in section 5—8—1(a)(1)(b) of the Corrections Code offends the constitutional principles announced in *Apprendi*." 318 Ill. App. 3d 340, 341-42. We allowed the State's petition for leave to appeal (177 Ill. 2d R. 315).

The State argues that the defendant's sentence does not violate principles of *Apprendi* or, in the alternative, a violation of *Apprendi* does not warrant resentencing given the reasoning of this court's recent opinions in *People v. Thurow*, 203 Ill. 2d 352 (2003) (applying harmless error analysis to *Apprendi* violations), and *People v. Crespo*, 203 Ill. 2d 335 (2001) (applying plain error analysis). By way of cross-appeal, the defendant reiterates his appellate contention that his constitutional right to a speedy trial has been violated. For the reasons that follow, we affirm in part and reverse in part.

A comprehensive and detailed recitation of the procedural history of this case and the evidence adduced at defendant's trial and sentencing hearing is not necessary for our analysis. The pertinent facts are those which bear upon the parties' speedy-trial and sentencing issues. Hence, we will at this juncture summarize the relevant evidence presented at defendant's retrial, in order to provide a general overview, and more fully treat facts specifically relating to the speedy-trial and sentencing issues in our discussion of those issues.

Defendant was tried for the murder of 86-year-old Millie Nielsen. The evidence indicated that defendant broke into Nielsen's apartment where he stabbed, beat, and strangled her in the course of an attack that apparently started in Nielsen's kitchen and concluded in her bedroom. Defendant took items of minimal value from Nielsen's residence and was later apprehended in possession of some of her bloodstained personal belongings. When he was arrested, officers observed bloodstains on the quilted shirt defendant was wearing, and bloodstained jeans were recovered from the trunk of his car. A witness testified that he had seen defendant in the backyard of Nielsen's apartment building on the night of the murder. The witness saw defendant carry a bag through the backyard, place it in the trunk of his car, and drive away.

Dr. Michael Chambliss performed the medical examination of Nielsen's body and testified to her extensive injuries. Dr. Chambliss concluded that Nielsen died as a result of manual strangulation with the contributing factors of blunt force injuries and stab wounds. Dr. Chambliss stated that Nielsen could have died from the blunt force injuries alone.

Pamela Fish, an expert in electrophoresis, serology, and DNA analysis, testified to the results of her 1987 examination of the physical evidence. At that time, she determined the blood found on defendant's jacket and jeans was consistent with Nielsen's blood type and could not have come from defendant. Fish determined that the substance on other evidentiary items was human blood, but due to the small quantity provided, she was unable to identify a particular blood type. Prior to defendant's second trial, Fish attempted to perform DNA testing on blood samples collected in this case; however, their small size and degraded condition made testing ineffective.

Rod Englert, an expert in crime scene reconstruction and blood splatter, examined the physical evidence and photographs in the case. Englert stated that the blood on Nielsen's kitchen floor appeared smeared, indicative of a struggle in which someone bled. Englert noted that the blood on the kitchen wall immediately outside the bedroom represented classic medium velocity splatter, suggestive of blunt force being inflicted upon the victim. Given the low angle of projection, Englert believed that Nielsen had received numerous blows while on the kitchen floor. Englert concluded that the blood on the knees of defendant's jeans, and the back of his shirtsleeves, represented transfer stains—blood swiped against something or someone. The blood on the front of defendant's shirtsleeves represented medium velocity splatter. The blood at the bottom of defendant's jeans was also consistent with medium velocity splatter. Eng-

lert testified that these stains were not consistent with defendant having picked up a bag with blood on it or with such a bag having been placed on top of clothing. Englert further stated the stains were not consistent with defendant having kneed another person in the nose.

Defendant testified, offering an explanation for the blood on his clothes and his possession of Nielsen's belongings. Defendant claimed he had been involved in three fights prior to the night of Nielsen's murder, and he intimated that the blood on his clothing had been deposited there during one or more of those altercations. Defendant claimed two of the fights were with his friends, Tom Szeszol and Bill Henderson, while a third fight involved an unidentified man who was attempting to break into defendant's car. In the latter fight, defendant stated, he hit the man three or four times in the face and kneed him in the nose. According to defendant, everyone involved in the fights bled.

As for his possession of Nielsen's bloodstained property, defendant stated he had noticed a bag on the side of Nielsen's apartment building. He looked inside the bag and discovered therein a box of silverware. He picked up the bag, carried it to his car, and placed it in the trunk. Later that morning, defendant decided to look into the bag and removed the bag's contents, some or which were bloody. Defendant kept some items and disposed of others, including a bloody pillowcase, in a Dumpster. Defendant sold some of the items for $60.

Given this evidence, the jury found that defendant had committed the murder of Millie Nielsen. We turn our attention to a discussion of the law governing the constitutional right to speedy trial, followed by a recitation of the circumstances preceding defendant's retrial and the facts pertinent to defendant's speedy-trial issue.

## SPEEDY TRIAL

Both the United States Constitution and the Consti-

tution of Illinois guarantee an accused the right to a speedy trial. U.S. Const., amend. VI; Ill. Const. 1970, art. I, § 8. In *Barker v. Wingo*, 407 U.S. 514, 33 L. Ed. 2d 101, 92 S. Ct. 2182 (1972), the United States Supreme Court addressed the nature of the constitutional right to a speedy trial and recognized the need to set out "criteria by which [a constitutional] speedy trial right is to be judged." *Barker*, 407 U.S. at 516, 33 L. Ed. 2d at 109, 92 S. Ct. at 2185. This court has acknowledged the competing interests recognized in *Barker*'s discussion of the constitutional right to speedy trial, and we consider in our own analysis the "four factors" identified in that case "together with such other circumstances as may be relevant." *Barker*, 407 U.S. at 533, 33 L. Ed. 2d at 118, 92 S. Ct. at 2193; *People v. Crane*, 195 Ill. 2d 42, 46-48 (2001).

As we observed in *Crane*:

"[T]he right to a speedy trial is 'a more vague concept than other procedural rules,' which makes it 'impossible to determine with precision when the right has been denied.' *Barker*, 407 U.S. at 521, 33 L. Ed. 2d at 112, 92 S. Ct. at 2187. Instead, determining whether an accused's constitutional right to a speedy trial has been violated 'necessitates a functional analysis of the right in the particular context of the case.' *Barker*, 407 U.S. at 522, 33 L. Ed. 2d at 112, 92 S. Ct. at 2188. Because of the seriousness of the remedy—'a defendant who may be guilty of a serious crime will go free, without having been tried'—the right to a speedy trial should always be in balance, and not inconsistent, with the rights of public justice. *Barker*, 407 U.S. at 522, 33 L. Ed. 2d at 112, 92 S. Ct. at 2188." *Crane*, 195 Ill. 2d at 47.

In order to strike a proper analytical balance between society's interests and those of an accused, the Supreme Court in *Barker* identified four factors to be considered: the length of the delay; the reasons for the delay; defendant's assertion of his right; and the prejudice, if any, to the defendant. *Barker*, 407 U.S. at 530, 33 L. Ed.

2d at 116-17, 92 S. Ct. at 2192. No one factor is dispositive. *Barker*, 407 U.S. at 530-33, 33 L. Ed. 2d at 116-19, 92 S. Ct. at 2192-93; *Crane*, 195 Ill. 2d at 52. The ultimate determination of whether a defendant's constitutional speedy-trial right has been violated is subject to *de novo* review. *Crane*, 195 Ill. 2d at 52. Applying the *Barker* factors to the facts of this case, it is clear that defendant's constitutional right to a speedy trial has not been violated.

On March 31, 1993, the appellate court filed an opinion in which it reversed the defendant's murder conviction and remanded for a new trial. The appellate court's mandate was filed in the circuit court on July 19, 1993. Defendant's retrial commenced on November 18, 1996.

When assessing a constitutional speedy-trial claim, the first consideration is the length of the delay. In general, courts have recognized a delay approaching one year to be "presumptively prejudicial." *Barker*, 407 U.S. at 530-31, 33 L. Ed. 2d at 117, 92 S. Ct. at 2192; *Crane*, 195 Ill. 2d at 52-53. Obviously, the delay in this case qualifies as presumptively prejudicial. A finding of "presumptive prejudice," however, does not imply that the delay will be found to have actually prejudiced the defendant. Rather, it simply marks the point at which courts deem the delay unreasonable enough to trigger the full *Barker* inquiry. *Doggett v. United States*, 505 U.S. 647, 656, 120 L. Ed. 2d 520, 531, 112 S. Ct. 2686, 2693 (1992); *Crane*, 195 Ill. 2d at 53. Therefore, we next address the second *Barker* factor, the reason for the delay.

During the period beginning on May 28, 1993, and ending November 18, 1996, the common law record evinces 39 continuances by agreement of the parties, 3 by order of the court, and 3 granted on motion of defendant. The case was continued four times because defense counsel failed to appear. During this period of

time, defendant was represented by six different attorneys—three with the Cook County public defender's office and three private attorneys—all of whom required time to familiarize themselves with, what one described as, "two to three feet" of discovery and the voluminous record after they assumed responsibility for defendant's representation. Although the common law record is not a model of clarity, we have considered it, together with the transcripts contained in the record on appeal, so that we may do justice to both the State and the defendant. See *People v. Mayo*, 198 Ill. 2d 530, 536 (2002). It would needlessly lengthen this opinion if we were to *specifically* address the circumstances of each continuance in this case; however, we *have* reviewed individually the circumstances of each delay, and we conclude that no more than three months of delay can be attributed to causes independent of the actions of defendant's attorneys.

A delay is considered to have been occasioned by the defendant when the defendant's acts caused or contributed to the delay. *Mayo*, 198 Ill. 2d at 537. When a defense attorney requests a continuance on behalf of a defendant, any delay caused by that continuance will obviously be attributed to the defendant. *Mayo*, 198 Ill. 2d at 537. Moreover, an agreement to continue the case is properly chargeable to defendant. *People v. Kliner*, 185 Ill. 2d 81, 115, 121 (1998); see *People v. Plair*, 292 Ill. App. 3d 396, 398, 400 (1997). Further, when a defendant's attorney fails to appear in court at the appointed time, his absence causes a delay attributable to the defendant. *Kliner*, 185 Ill. 2d at 117. Applying the foregoing principles to the facts of this case, we find that the defendant caused or contributed to nearly all the pretrial delay at issue.

Defendant's suggestion that the lengthy delay between remand and retrial was the result of the State's failure to timely disclose material in discovery is belied

by those transcripts that have been made a part of the record on appeal which reveal no pertinent objections or complaints by defendant's attorneys with respect to the State's disclosure of materials. This observation also applies to defendant's contention that the protracted delay resulted solely from the State's efforts to obtain additional testing of bloodstained evidentiary items. Until defendant's final attorney filed a motion for discharge on speedy-trial grounds just before trial, defendant's preceding attorneys seemed perfectly content to continue the case by agreement or on defense motion, either because they were unprepared to proceed, or because they wanted to see if blood testing would corroborate defendant's testimony from his first trial, which suggested that the blood on his clothing had come from a source other than Nielsen. While it is true that the State used the period between remand and retrial to pursue further testing, defendant cannot escape the consequences of his attorneys' conduct which caused or contributed to most of the delay.

With respect to the third *Barker* factor, the defendant's assertion of his speedy-trial right, we note that a defendant is bound by the actions of his attorney, unless the defendant clearly and convincingly asserts his right to discharge his attorney. *Mayo*, 198 Ill. 2d at 537; *Kliner*, 185 Ill. 2d at 118. As this court observed in *People v. Bowman*, 138 Ill. 2d 131, 141 (1990): "In criminal proceedings, an attorney is authorized to act for his client and determine for him procedural matters and decisions involving trial strategy and tactics. [Citations.] Thus, the affirmative acts of a defendant's counsel cannot be separated from the defendant's own acts." Defendant in this case was at all pertinent times represented by counsel.

Defendant at various times attempted to assert his right to a speedy trial; however, until shortly before

retrial, he did so against the wishes of his attorneys, who were not prepared or inclined to proceed. Generally, the decision to demand a speedy trial and to seek dismissal of the State's charges on such grounds are matters left to the sound strategic decision of counsel. See *People v. Ramey*, 151 Ill. 2d 498, 523-24 (1992). As this court observed in *Bowman*, "[d]efendant cannot contend that it was unfair to force him to choose between a speedy trial and effective assistance of counsel. Defendant may have a right, even of constitutional dimensions, to pursue whichever course he chooses, but the Constitution does not forbid requiring him to choose nonetheless." *Bowman*, 138 Ill. 2d at 148. Defendant made his choice in this matter.

Defendant first "asserted" his right to a speedy trial on July 21, 1993, when appointed counsel informed the court that defendant, "on his own motion," was demanding a speedy trial. Counsel told the court, "I certainly would not be ready at this point professionally." The court warned the defendant of the dangers of proceeding with an attorney who was not prepared. Defendant responded, "I'll wait." He explicitly agreed to a continuance.

On October 12, 1994, defendant made an oral, *pro se* motion for discharge on statutory speedy-trial grounds. The circuit court advised defendant to put his motion in writing. Defendant subsequently filed a written, *pro se* motion on November 18, 1994, claiming a violation of "the speedy trial act." Defendant, acting in a *pro se* capacity, announced he was ready for trial on that date. He was given the opportunity to argue his *pro se* motion, but admitted he was not ready to do so and requested a continuance. The court denied defendant's request for a "bar association lawyer." Defendant did not ask to discharge appointed counsel and proceed *pro se*.

Hearing on defendant's *pro se* motion was later

continued again because defendant was not prepared to proceed. We find nothing in the record which would indicate that defendant's motion was ever argued or that the court rendered a ruling thereon. The same is true with respect to a second *pro se* motion for appointment of a "bar association attorney." Defendant never attempted to assert his right to discharge his attorney and proceed to an immediate trial. The record unequivocally shows that defendant wanted the assistance of counsel in preparing his defense for trial. Thus, defendant is bound by the actions of his attorneys. See *Mayo*, 198 Ill. 2d at 537

The fourth and final consideration in the *Barker* analysis is prejudice to the defendant. Prejudice must be assessed in the light of the interests of defendants which the speedy-trial right was designed to protect. *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118, 92 S. Ct. at 2193. Those interests are (1) the prevention of oppressive pretrial incarceration, (2) the minimization of defendant's anxiety and concern about the pending charge, and (3) the limitation of the possibility that the defense will be impaired by the delay. *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118, 92 S. Ct. at 2193; *Crane*, 195 Ill. 2d at 59. The third factor has been recognized by the Supreme Court as the most serious " 'because the inability of a defendant adequately to prepare his case skews the fairness of the entire system.' " *Doggett*, 505 U.S. at 654, 120 L. Ed. 2d at 530, 112 S. Ct. at 2692, quoting *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at 118, 92 S. Ct. at 2193.

In this case, defendant has not specified how his ability to prepare his defense was impaired or adversely affected by the delay in retrying the murder charge. If witnesses die or disappear during a delay, prejudice is obvious. Clearly, there is also prejudice if defense witnesses are unable to recall accurately events of the distant past. See *Barker*, 407 U.S. at 532, 33 L. Ed. 2d at

118, 92 S. Ct. at 2193. We see no evidence of such prejudice in this case. With the exception of additional blood-splatter evidence in defendant's second trial, the evidence adduced by both sides at defendant's second trial was substantially the same as the evidence properly presented at his first trial. The State's use of blood-splatter evidence at the second trial does not qualify as *impairment* of defendant's ability to present *his* defense.

Defendant also claims that he experienced anxiety while awaiting retrial. We note that this factor is present to some extent in every case and absent some unusual showing, this inconvenience alone is of slight import. *People v. Wills*, 153 Ill. App. 3d 328, 337 (1987); 2 W. LaFave & J. Israel, Criminal Procedure § 18.2, at 410 (1984). No doubt much of the anxiety defendant experienced was the result of having been already once tried by a jury, having been found guilty of Nielsen's murder, and having been sentenced to a term of natural life imprisonment. We are of the opinion that the weight to be accorded the first two components of the fourth *Barker* factor is minimal under the circumstances of this case.

The balancing that we are required to perform must take into account the rights of the defendant, but does not preclude the rights of public justice. *Crane*, 195 Ill. 2d at 62. Although the delay between remand and retrial was indeed lengthy, and the State admittedly used that time to its advantage, the defendant cannot escape responsibility for causing or contributing to most of the delay. Considering that fact, together with lack of any showing that the delay impaired the presentation of a defense, we conclude that defendant's constitutional right to a speedy trial was not violated. We therefore affirm the judgment of the appellate court in this respect.

### APPRENDI ISSUE

The State's *Apprendi* argument in this case has changed with our evolving *Apprendi* jurisprudence. The

State's original brief was filed prior to our decisions in *People v. Swift*, 202 Ill. 2d 378 (2002), *People v. Thurow*, 203 Ill. 2d 352 (2003), and *People v. Crespo*, 203 Ill. 2d 335 (2001).

Relying upon our decisions in *People v. Ford*, 198 Ill. 2d 68 (2001), and *People v. Hopkins*, 201 Ill. 2d 26, 40 (2002) ("when any statutory enhancing aggravating factor is proved to exist beyond a reasonable doubt, *** the original sentencing range increases according to the statutory scheme"), the State initially argues that the jury's findings of guilt on charges of residential burglary, home invasion, and armed robbery at defendant's first trial were sufficient to expand the sentencing range in this case and thus satisfy the requirements of *Apprendi* as interpreted by this court in *Ford* and *Hopkins*. The State reasons that the first jury's findings were the equivalent of finding that defendant committed the murder in the course of another felony, an aggravating factor that would have made the defendant eligible for the death penalty. See Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b)(6). Pursuant to this court's decisions in *Ford* and *Hopkins*, a sentence of natural life would thus have been within the allowable sentencing range, and a finding that defendant had engaged in brutal and heinous behavior indicative of wanton cruelty could have been used to set the specific sentence within the allowable range. Alternatively, in its original brief, citing, *inter alia*, *Neder v. United States*, 527 U.S. 1, 144 L. Ed. 2d 35, 119 S. Ct. 1827 (1999), the State argued that any *Apprendi* error in this case could be considered harmless because "the record clearly reflects that defendant murdered 86-year-old Millie Nielsen 'in a brutal or heinous fashion indicative of wanton cruelty' when he repeatedly beat, stabbed and strangled her after breaking into her apartment."

In its reply brief, the State acknowledged this court's holding in *Swift*—defendant's 80-year sentence violated

*Apprendi* because it was based on the *trial judge's* factual finding that the behavior was exceptionally brutal or heinous—but bolstered its position by reference to this court's decision in *Thurow*, wherein this court, for the first time, held that an *Apprendi* error could be deemed harmless. See *Thurow*, 203 Ill. 2d at 369-71. The State later obtained leave to cite this court's decision in *Crespo* as additional authority. In *Crespo*, this court held that the virtually identical *Apprendi* error, that had warranted reversal in *Swift*, was not plain error that would warrant reversal. The court reasoned:

> "On the basis of this overwhelming evidence that the crime was brutal and heinous, there is no basis for concluding that the *Apprendi* violation 'seriously affected the fairness, integrity or public reputation of judicial proceedings.' We have no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton cruelty. Accordingly, defendant has failed to show that the error was prejudicial." *Crespo*, 203 Ill. 2d at 348-49.

Clearly, after *Swift* there can be no doubt that the sentencing judge in this case violated principles of *Apprendi* when he sentenced defendant to an enhanced term of natural life based upon *his* finding that the murder was committed in a brutal and heinous manner indicative of wanton cruelty. However, it is equally clear, after *Thurow* and *Crespo*, that an *Apprendi* violation of this kind will not warrant resentencing where there is overwhelming evidence that the crime was committed in a brutal and heinous manner indicative of wanton cruelty. The conduct of the defendant in this instance qualifies as exceptionally brutal and heinous behavior indicative of wanton cruelty under *any* definition. Thus, defendant—who failed to object at trial—cannot demonstrate prejudice for purposes of plain error analysis.

The medical examination of Nielsen's body by Dr. Chambliss revealed extensive external and internal injuries. In the course of his external examination, Cham-

bliss found multiple abrasions, bruises and incises about Nielsen's upper body, including her head, chest and arms. Stab wounds were also found on her left thigh, the left part of her groin, and right forearm. Two additional incise wounds were noted on her left leg. An internal exam revealed injuries indicative of manual strangulation, including hemorrhages of the larynx, tongue and esophagus, as well as numerous blunt trauma injuries, including hemorrhaging of the membrane of the brain and a fractured larynx. Although Chambliss concluded that Nielsen died as a result of manual strangulation, with contributing factors of blunt force injuries and stab wounds, he believed the blunt force injuries were so severe that she could have died from them alone. From Chambliss' testimony, it is clear that Nielsen's body was literally covered with bruises. Physical evidence in this case suggests an intense and prolonged struggle that began in Nielsen's kitchen and ended in her bedroom.

This court defines "heinous" behavior as behavior that is hatefully or shockingly evil; grossly bad; enormously and flagrantly criminal. *People v. Nielson*, 187 Ill. 2d 271, 299 (1999); *People v. Lucas*, 132 Ill. 2d 399, 445 (1989); *People v. La Pointe*, 88 Ill. 2d 482, 501 (1981). "Brutal" behavior is behavior that is grossly ruthless, devoid of mercy or compassion; cruel and cold-blooded. *Nielson*, 187 Ill. 2d at 299; *Lucas*, 132 Ill. 2d at 445; *La Pointe*, 88 Ill. 2d at 501. Finally, "wanton cruelty" requires proof that the defendant consciously sought to inflict pain and suffering on the victim of the offense. *Nielson*, 187 Ill. 2d at 299; *People v. Pastewski*, 164 Ill. 2d 189, 194 (1995).

The senseless, vicious murder of this elderly woman, effected by means of beating, stabbing and strangling, in order to perpetrate a robbery that could have been easily accomplished without killing her, undoubtedly qualifies as exceptionally brutal and heinous behavior. The man-

ner of the murder clearly indicates that the defendant consciously inflicted unnecessary mental and physical suffering on his victim, indicative of wanton cruelty. We have no doubt that a jury, presented with these facts, would have found that the crime was committed in a brutal and heinous manner, indicative of wanton·cruelty. Accordingly, we find that the failure to comply with the dictates of *Apprendi* does not require resentencing. In this respect, the judgment of the appellate court is reversed, the remainder of the appellate court's judgment is affirmed, and the judgment of the circuit court is affirmed.

*Appellate court judgment affirmed*
*in part and reversed in part;*
*circuit court judgment affirmed.*

JUSTICE KILBRIDE, specially concurring:

Today's decision follows *People v. Swift*, 202 Ill. 2d 378 (2002), *People v. Thurow*, 203 Ill. 2d 352 (2003), and *People v. Crespo*, 203 Ill. 2d 335 (2001). I dissented from the majority in *Thurow* and *Crespo* because I believed, and continue to believe, that an *Apprendi* violation can never be subject to a harmless error review. Nonetheless, having voiced my disagreement previously, I reluctantly concur in today's opinion only because the doctrine of *stare decisis* requires that we adhere to established precedent, even if certain members of the court disagree. *People v. Mitchell*, 189 Ill. 2d 312, 338 (2000).